UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------x
NULUX, INC.,

                                        Plaintiff,

        -against-                                          MEMORANDUM AND ORDER
                                                            01 CV 3023 (ILG)

RAFAEL RAMIREZ, LITELAB
CORPORATION, ALAN STORCH and
"JOHN DOE,"

                                        Defendants.
-----------------------------------------------x

GLASSER, United States Senior District Judge:


## INTRODUCTION

        Nulux Inc., a high-end lighting fixture manufacturer, alleges that rival Litelab

Corp. and its chief of design, former Nulux Inc. employee Rafael Ramirez, engaged in

trademark infringement, trade dress infringement, trade dress dilution, false

designation of origin, and unfair competition in violation of federal and New York laws

by manufacturing and selling identical lighting fixtures and producing and distributing a

marketing brochure that depicted the trade dress of Nulux Inc. fixtures.  Jurisdiction is

predicated on the federal questions presented.  The current motions by the defendants

seek partial summary judgment as to those claims.  For the following reasons, the

motions are granted in part and denied in part.

1

## FACTS

### 1.   Ramirez leaves Nulux, Inc. and joins Litelab Corp.

The plaintiff, Nulux Inc. ("Nulux"), manufactures lighting fixtures for museums, high-end retail businesses, and wealthy homeowners across the United States, Europe, and Asia.  Plaintiff's Local Rule 56.1 Statement of Material Facts ("Pl. 56.1 Statement"), dated July 18, 2007, ¶¶ 3, 9.  Founded in 1991 by Edison Price, Nulux receives business primarily through the referrals of professional lighting consultants, known in the lighting industry as "specifiers," and less frequently through dealers or architects. Affidavit of Delia Price ("Price Aff."), dated June 29, 2007, ¶ 6; Affidavit of Brooks Bragdon ("Bragdon Aff."), dated July 6, 2007, ¶ 11; Pl. 56.1 Statement ¶ 9.  Rafael Ramirez, a defendant in this matter, joined Nulux in 1993 as an assistant designer but rose to the position of chief designer in October of 1997, and in that capacity, he gained a comprehensive knowledge of Nulux's fixture designs.  See Pl. 56.1 Statement ¶¶ 12-13, 25-37.

In November of 1999, Ramirez told Frederick Spaulding, the Chief Executive Officer of defendant Litelab Corp. ("Litelab"), that Nulux was to be sold and that he did not want to work for the new owners.  Deposition of Frederick Spaulding ("Spaulding Dep."), dated August 29, 2002, at 83:3-17.  Ramirez was interested in joining Litelab. Id. at 82:21-82:15.  Litelab also manufactured museum and high-end retail store lighting, received its business through specifiers, and shared customers with Nulux. Defendants Local Rule 56.1 Statement of Material Facts ("Def. 56.1 Statement"), dated June 6, 2007, ¶ 2; Pl. 56.1 Statement ¶ 4; see Spaulding Dep. at 39:10-12, 59:16-17, 79:16-17.  Litelab and Nulux fixtures were often specified for the same projects, and

many Litelab fixtures looked similar to Nulux's fixtures.  <u>See</u> Spaulding Dep. at 65:11-18, 74:17, 139:23-25, 146:12-13.

After a number of discussions, Spaulding asked Ramirez to run Litelab's product design division.  <u>Id.</u> at 85:14-15.  Ramirez resigned from Nulux in December of 1999 and officially started working for Litelab on January 1, 2000.  Def. 56.1 Statement ¶¶ 3-4. After Ramirez left the company, client lists, copies of designs, a slide show of Nulux's design history, drawings, shipping records, a report containing test data results for Nulux lighting fixtures, and bills relating to important clients that were kept in Nulux's offices could not be found.  <u>See</u> Price Aff. ¶ 62; Affidavit of Frank Conti ("Conti Aff."), dated June 21, 2007, ¶¶ 25, 34; Affidavit of Robert Friedman ("Friedman Aff."), dated July 9, 2007, ¶ 10.  Nulux also discovered that 126 of the computer files that existed on Ramirez's work computer in August of 1999, many of which were designs for Nulux fixtures, were no longer on his computer after he departed.  <u>See</u> Affidavit of Ronnie Crepeau, dated June 28, 2007, ¶¶ 2-4, 11.  Nulux believes that Ramirez took the missing items with him to aid Litelab's business.  Pl. 56.1 Statement ¶ 70.  Litelab has denied using any of Nulux's property to fabricate its fixtures.  Declaration of Frederick Spaulding ("Spaulding Decl."), dated May 28, 2007, ¶ 23.

### 2.  Litelab replaces Nulux as Louis Vuitton's lighting vendor

In late 1998, Louis Vuitton ("LV"), which had been purchasing Nulux fixtures for its retail stores, was dissatisfied with Nulux's service and selected Litelab to replace Nulux as the manufacturer of its retail area fixtures.  Declaration of George Sexton ("Sexton Decl."), dated May 29, 2007, ¶¶ 16, 18.  Litelab received the specifications of the fixtures LV needed and has been providing fixtures that Nulux complains are

identical to its "Spotlux" and "Trulux" fixtures.  Id. ¶¶ 17, 19-20; Def. 56.1 Statement ¶ 46; Pl. 56.1 Statement ¶¶ 201, 202.

### 3.  The Winterthur Museum project

While Ramirez was still chief designer for Nulux, the company was hired by the Winterthur Museum ("Winterthur") near Wilmington, Delaware, to work on the "Period Room Restoration Project," a very large renovation that called for the installation of museum exhibit lighting in over 200 rooms throughout the Henry Francis DuPont mansion.  Pl. 56.1 Statement ¶ 162; see Deposition of Steven Hefferan ("Hefferan Dep."), dated July 31, 2003, at 6:10-7:3.  Nulux was the sole supplier of fixtures during the renovation of the first four floors of the museum, and due to problems with deliveries from Nulux, the quality and performance of the Nulux fixtures, and concerns about the financial stability of Nulux, Winterthur decided to seek an alternate supplier of the same fixtures that Nulux was providing.  See Deposition of Michael Dixon ("Dixon Dep."), dated June 23, 2004, at 15:13-23.

After joining Litelab, Ramirez helped draft a proposal to produce fixtures for Winterthur that would replicate the look and function of the Nulux fixtures already installed.  Hefferan Dep. at 29:1-4, 31:5-32:6; see Dixon Dep. at 41:13-21, 45:2-6.  After receiving assurances from Litelab that it could create a product that was similar if not identical to Nulux's in both function and appearance, Winterthur ordered Litelab fixtures for half of the museum's 7th floor.  Litelab provided the fixtures, but they suffered from electrical problems and were not functionally interchangeable with the Nulux fixtures.  Spaulding Dep. at 92:13-94:9; see Dixon Dep. at 46:21-23, 55:6-59:18,

4

67:15-68:4.  As a result, Winterthur terminated its relationship with Litelab and relied on Nulux to complete the rest of the lighting project.  <u>See</u> Hefferan Dep. at 37:21-38:10.

Nulux complains that Litelab manufactured fixtures for Winterthur that were nearly identical in appearance to Nulux's "Spotlux" and "Slotlux" fixtures and has proffered an expert report by lighting specifier Gary Gordon to that effect.  <u>See</u> Rapaport Aff. ¶¶ 73, 77; Gordon Aff., Ex. F at 16.  Litelab has admitted that it manufactures a fixture similar to Nulux's "Slotlux" fixture.  <u>See</u> Spaulding Dep. at 47:11-18.  Moreover, Litelab's proposal included fixture drawings that Nulux contends were actually Nulux drawings which Ramirez had taken from Nulux's offices and then altered, an allegation supported by the fact that one of the fixture drawings included in Litelab's proposal was labeled a "Slotlux 4," a Nulux fixture name.  Gordon Aff. ¶¶ 30, 31; <u>see</u> Rapaport Aff., Ex. 21.

### 4.  The Litelab marketing brochure

In October of 2000, Litelab sent a cover letter and marketing brochure to approximately one hundred individuals, mostly lighting specifiers, who were potential customers of both Litelab and Nulux.  Def. 56.1 Statement ¶ 70; Pl. 56.1 Statement ¶ 155.  The brochure's cover read "Conceptual Renderings – Litelab's Museum Collection," and the contents consisted of four pages of track lighting drawings labeled "Litelab Museum Concept A" through "Litelab Museum Concept D." Friedman Aff., Ex. M.  The cover letter described the concepts as "four distinct styles . . . arrived at based on conversations and requests from you or your colleagues over the years . . . ."  <u>Id.</u>  The purpose of this mailing was to see whether one of the particular styles of fixture would be more appealing than the others.  <u>See</u> Spaulding Dep. at 69:10-70:4.  Spaulding has

testified that the fixtures depicted in the marketing brochure are "generic forms" in the industry and could be similar to other manufacturers' designs. Litelab has since manufactured fixtures that look similar to those depicted in the marketing brochure. Spaulding Dep. at 74:21-78:18, 139:3-16, 140:11-17.

Nulux believes that Litelab sought to benefit by appropriating the appearance of its lighting fixtures and contends that Concepts "A" and "B", which Ramirez provided the concept sketches for, are not industry standard styles but instead are identical to well-known Nulux track lighting fixtures, specifically its "Parlux" and "MRlux" fixtures. Friedman Aff., Ex. MM; see Rapaport Aff. ¶¶ 91, 114. Nulux has proffered two expert reports to this effect. See Friedman Aff., Ex. MM; Gordon Aff., Ex. F.

### 5. Nulux sales and advertising

Nulux has manufactured and sold the "Slotlux" and "Parlux" fixtures since 1992, the "Spotlux" since 1994, the "MRlux" since 1995, the "Washlux" since 1997, and the "Trulux/Trlux" since 1998. See Gordon Aff. ¶¶ 13-14.[1] These products have been sold continuously in their original form. Bragdon Aff. ¶ 14. Nulux avers that sales of Slotlux, Spotlux, Washlux, Trulux/Trlux, Parlux, and MRlux represented more than 30% of its business in 2000 but did not proffer how much revenue this business generated. Nulux has proffered two spreadsheets listing the sales of Parlux and MRlux, but neither spreadsheet provides information prior to December of 1998. See Rapaport Aff., Ex. 40. Brooks Bragdon, who has worked for Nulux since 1993 and is familiar with its finances,

---

[1] In the Amended Complaint, Nulux averred that the defendants produced and sold a lighting fixture called the "Gorge" which infringed on a Nulux product of the same name and appearance. Amended Complaint ¶¶ 77-78, 89. Nulux, however, effectively conceded its claims as to the "Gorge" fixture in its memorandum in opposition to this motion after it was unable to produce evidence that it ever manufactured the "Gorge" fixture while Ramirez was chief of design. See Plaintiff's Memorandum of Law in Opposition to Motions by Defendants for Summary Judgment, dated July 19, 2007, at 26-27.

testified that, by the mid to late 1990s, Nulux realized from 2 to 3 million dollars per year in sales, but he did not specify the percentage of that revenue derived from the sale of the fixtures at issue here.  See Bragdon Aff. ¶ 14. Bragdon also avers that as of 1997, Nulux fixtures were purchased and installed in approximately 40 different projects.  Id. Nulux, however, provides no industry data to put this evidence into the proper context of the high-end lighting market.

Nulux directs its sales efforts at specifiers, architects, and affluent lighting consumers, but it does little advertising, spending only $13,000 in 2001, $13,000 in 2002, and $32,000 in 2003.  Price Aff. ¶ 6; see Affidavit of Paul Perlman ("Perlman Aff."), dated June 4, 2007, Ex. 13; Friedman Dep. at 73:6-11; Affidavit of Gloria Colon, dated July 18, 2007, ¶ 9.  No advertising expenditure figures were proffered for years prior to the alleged infringement.  Until his death in 1997, Edison Price personally promoted Nulux's fixtures by calling and writing lighting specifiers, inviting them to Nulux's offices to view fixtures and show slides of fixture models and completed projects, sending them drawings or descriptions of fixtures, and displaying his drawings at a light fair.  Bragdon Aff. ¶ 10.  Within two or three months after Price's death, Nulux created a fixtures catalogue with photographs of completed projects and drawings of fixtures.  The catalogue was distributed to sales representatives, specifiers, and architects.  Id. ¶ 12.

In response to Litelab's interrogatories, Nulux stated that the little advertising it did consisted of participating in lighting and museum trade shows, placing ads in lighting industry journals, sponsoring tables at lighting industry events, distributing

promotional samples and the Nulux catalogue, affiliating with sales representatives, and promoting by word of mouth.  Perlman Aff., Ex. 13.

### 6.  Passing off Nulux fixtures as Litelab fixtures

Nulux accuses Litelab of purchasing 212 Nulux products from a third party fixture retailer from 2000 to 2002 and passing them off as Litelab fixtures.  Pl. 56.1 Statement ¶ 203.  Litelab often purchased other manufacturers' lighting fixtures on the open market to complete projects, especially when a client requested it, and it specifically purchased Nulux fixtures for its work on LV retail stores.  Spaulding Dep. at 142:16-143:20, 147:9-148:1.  Litelab denies ever representing to LV that any Nulux fixtures were Litelab fixtures.  Def. 56.1 Statement ¶ 80.  Spaulding testified that any Nulux fixture that Litelab purchased and used on a job retained its "Nulux" labels and that no "Litelab" labels were added.  Def. 56.1 Statement ¶ 79.  Litelab further maintains that it would alter a Nulux fixture only if it did not functionally meet the requirements of local code.  Spaulding Dep. at 147:9-148:1.

### 7.  Litelab's use of the trademark "Nulux" and "Slotlux"

Nulux accuses Ramirez of using a request form bearing the trademark "Nulux" while at Litelab to request a diamond core drill bit from a tool supplier.  Pl. 56.1 Statement ¶ 113. <u>see</u> Conti Aff., Ex. R.  Ramirez denies that he ever handled a document with Nulux's name on it while at Litelab.  Deposition of Rafael Ramirez, dated April 2, 2003, at 129:1-3.  Nulux also accuses Litelab and Ramirez of using its trademark "Slotlux" but made no such claim in its Amended Complaint.

## PROCEDURAL HISTORY

Nulux brought this action in the Supreme Court of New York County on February 7, 2001, and all three defendants had the action removed to this Court in May of 2001. The parties have twice stipulated to amendments of the pleadings, and discovery has concluded.  Nulux brings federal and state claims for fraud, breach of fiduciary trust, conversion, negligence, breach of contract, replevin, unfair competition, trade dress infringement, trade dress dilution, trademark infringement, false designation of origin/false advertising, injunctive relief, attorneys fees, and an accounting against Litelab, Ramirez, and Alan Storch who is a defendant in the claims that are not at issue here.

Litelab filed for partial summary judgment on June 6, 2007.  Ramirez filed a companion motion for partial summary judgment that incorporated by reference Litelab's statement of facts.  Nulux conceded its fraud claim against Litelab, its federal trade dress dilution claim against both Litelab and Ramirez, and its trademark infringement claim except for one-time improper uses by Litelab and Ramirez of "Nulux" and "Slotlux."  See Plaintiff's Memorandum of Law in Opposition to Motions by Defendants for Summary Judgment, dated July 19, 2007, at 20-21.  The remaining claims to consider on summary judgment are (1) infringement of Nulux's trade dress,[2] (2) false designation of origin , (3) unfair competition to the extent that Nulux claims

---

[2] The defendants do not explicitly move for summary judgment as to the claim for trade dress infringement.  Rather, they move for summary judgment as to all the counts to the extent they allege any impropriety with regard to the marketing brochure and sales to LV and the Winterthur museum.  See Defendant's Notice of Motion, dated June 6, 2007.  Because the claim of trade dress infringement is grounded on those facts, the defendants have effectively moved for summary judgment as to the trade dress infringement claim.

Litelab sold genuine Nulux products as if they were its own, (4) infringement of trademarks "Nulux" and "Slotlux," and (5) state law trade dress dilution.

## DISCUSSION

### A.   Standard for summary judgment

 "The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party has the burden to demonstrate that no genuine issue of material fact exists, and the Court must draw all reasonable inferences in favor of the non-moving party.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." Bikerstaff v. Vassar College, 196 F.3d 435, 452 (2d Cir. 1999).

The Court's charge is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.  Only material that would be admissible at trial may be relied upon.  Major League Baseball Properties Inc. v. Salvino Inc., No. 06 Civ. 1867, 2008 WL 4181298, at *17 (2d Cir. Sept. 12, 2008).  Any affidavits supporting or opposing the summary judgment motion must be made on personal knowledge and must affirmatively show that the affiant is competent to testify on the matters therein.  Id. (citing Fed. R. Civ. P. 56(e)).

**B.      Trade dress infringement claim under the Lanham Act and state law**

Section 43(a) of the Lanham Act provides for a cause of action against:

> [a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device . . . or any false designation of origin . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval of his or her goods. . . .

15 U.S.C. 1125(a)(1)(A).  Protection thereunder extends to a product's trade dress.

Cartier, Inc. v. Sardell Jewelry, Inc., No. 07 Civ. 1813, 2008 WL 4206330, at *1 (2d Cir. Sept. 8, 2008).  "A product's trade dress encompasses the overall design and appearance that make the product identifiable to consumers."  Id. (quoting Nora Beverages, Inc. v. Perrier Group of Am., Inc., 269 F.3d 114, 118 (2d Cir. 2001)).  Protecting a product's trade dress defends manufacturers of desirable products from imitation that takes advantage of a consumer's ability to evaluate the quality of a product quickly.  Qualitex Co. v. Jacobson Prods. Co., Inc., 514 U.S. 159, 163 (1995).  Because some forms of imitation are beneficial, protection must only be granted when it serves the interest of competition.  TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 28-29 (2001).  The plaintiff must prove (1) that the trade dress is non-functional, (2) the trade dress has acquired distinctiveness, and (3) there is a likelihood of confusion between its good and the defendant's good.  Sardell Jewelry, 2008 WL 4206330 at *1 (citing Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 115 (2d Cir. 2001).

**i.      Secondary meaning**

Product design trade dress is distinctive if it has acquired secondary meaning. Wal-Mart Stores, Inc. v. Samara Brothers, Inc., 529 U.S. 205, 216 (2000).  "The 'second'

in secondary meaning signifies the fact that, with time and market exposure, a particular
trade dress may come to identify not only the goods but the source of the goods."
George Basch Co., Inc. v. Blue Coral, Inc., 968 F.2d 1532, 1536 (2d Cir. 1992) (quoting
20th Century Wear, Inc. v. Sanmark-Stardust, Inc., 815 F.2d 8, 10 (2d Cir. 1987))
(internal quotation marks omitted).   The plaintiff must prove that a substantial segment
of the relevant consumers in the plaintiff's market associates the product's trade dress
with the product's source.  See Centaur Commc'ns., Ltd. v. A/S/M Commc'ns., Inc., 830
F.2d 1217, 1221-22 (2d Cir. 1987) ("it is not always the *general* public's understanding . .
. it is only necessary to show that a substantial segment of the relevant group of
consumers made the requisite association between the product and the producer").

In this case, no party challenges that high-end lighting purchases are most often
made by, or on the advice of, lighting specifiers, dealers, and architects.  Bragdon  Aff. ¶
11; see Price Aff. ¶ 6; Sexton Aff. ¶¶ 10, 12.  Litelab has admitted that a "knowledgeable
lighting expert," as opposed to the general public, would be able to identify Nulux
fixtures as manufactured by Nulux.  Def. 56.1 Statement ¶¶ 89, 90.  However, there is no
evidence from which to infer that such persons constitute a "substantial segment" of
relevant consumers.

Proof that the trade dress has acquired secondary meaning "entails vigorous
evidentiary requirements" and places a heavy burden on the plaintiff.  DAG Media, 478
F. Supp. 2d at 369 (quoting Bristol-Meyers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d
1033, 1041 (2d Cir. 1992)); see Ergotron Inc. v. Ergonomic Support Sys., Inc., No. 94
Civ. 2732, 1996 WL 143903, at *7 (S.D.N.Y. March 29, 1996); Duraco Prods., Inc. v. Joy
Plastic Enters., Ltd., 40 F.3d 1431, 1453 (3d Cir. 1994) (in product design trade dress

12

cases, secondary meaning "will generally not be easy to establish").  Six factors are

instructive: (1) consumer studies, (2) advertising, (3) sales success, (4) unsolicited

media coverage of the product, (5) plagiarism of trade dress, and (6) length and

exclusivity of the trade dress use.  See Centaur Commc'ns., 830 F.2d at 1222.  No single

factor is determinative, and every element need not be proved.  Id.  "Because a producer

may use a competitor's trade dress if it is without secondary meaning, the proper time

period for determining secondary meaning is when the alleged infringement began . . . ."

New Colt Holding Corp. v. RJG Holdings of Florida, Inc., 312 F. Supp. 2d 195, 206-07

(D. Conn. 2004) (citing Nora Beverages, Inc. v. Perrier Group of Am. Inc., 164 F.3d 736,

745 (2d Cir. 1998).  In this case, the alleged infringement began between 2000 and 2002

after Litelab hired Ramirez.

### a.  Consumer studies

Consumer surveys provide the most persuasive evidence of secondary meaning

because they provide direct evidence of whether relevant consumers associate trade

dress with the company of origin.  Jewish Sephardic Yellow Pages, Ltd. v. DAG Media,

Inc., 478 F. Supp. 2d 340, 370 (E.D.N.Y. 2007) (quoting Ergotron,1996 WL 143903 at

*8).  None of the parties have proffered a consumer survey.  Nulux largely relies on the

assertions of Bragdon and Conti, both Nulux managers, as to the distinctiveness of their

own product.  See Bragdon Aff. ¶ 13; see Conti Aff. ¶¶ 14, 39, 46.  These statements are

both conclusory and self-serving.

The testimony of relevant consumers can be anecdotal evidence of trade dress

recognition, but as the court in Centaur Commc'ns. explained, such testimony is due

little weight when the basis for the statement is not disclosed:

> Although the witness testified that he had questioned various people about [the mark], it is unclear whether they were representative of the relevant market.  Again, the witness estimated there are approximately 5,000 to 10,000 individuals in that market, but does not reveal whether he spoke to 5 or 50 of them.  Similarly, the record does not indicate how representative [the second witness's] experience at his particular advertising agency was compared to other agencies.  Thus, though testimony of these witnesses is relevant, its significance is limited.

830 F.2d at 1223 (citation omitted).  Although Gary Gordon, a lighting specifier, is a relevant consumer, the plaintiff did not establish the basis for his testimony that Nulux's fixtures are "widely known and admired by specifiers."  See Gordon Aff. ¶¶ 10, 15.  First, there is no evidence that he asked other relevant consumers about Nulux's trade dress.  Second, Gordon worked with Edison price since Nulux's founding in 1991 and has frequently specified Nulux fixtures.  The record does not suggest that this familiarity with Nulux's products is representative of other relevant consumers.  Third, the extensive list of his professional accomplishments suggests a level of expertise that may not be representative of the relevant consumer group.  His testimony, therefore, deserves little weight.

### b.  Advertising

The success of product advertising is indirect evidence of the relevant consumer group's recognition of trade dress. Centaur Commc'ns., 830 F.2d at 1222-23; see Air Cargo News, Inc. v. Tabmag Publ'g., Ltd., No. 07 Civ. 480(DLI), 2007 WL 1101183, at *8 (E.D.N.Y. April 11, 2007).  Evidence that the advertising reached the relevant consumer group or was successful in generating revenue permits the inference that the advertising helped achieve secondary meaning.  See PaperCutter, Inc. v. Fay's Drug Co., Inc., 900 F.2d 558, 564 (2d Cir. 1990); Centaur Commc'ns., 830 F.2d at 1222 (plaintiff's increased

revenue after advertising and other promotional activities demonstrated the success of those activities).  Advertising expenditures or proof of other promotional efforts, when taken alone, do not indicate advertising success.  BigStar Entm't., Inc. v. Next Big Star, Inc., 105 F. Supp. 2d 185, 202 (S.D.N.Y. 2000).

Robert Friedman, Nulux's Vice President of design, admitted that Nulux does very little advertising.  Nulux has not provided any advertising expenditure figures for the period of time prior to Litelab's alleged infringement, and the testimony as to Edison Price's promotional efforts does not specify how many relevant consumers the advertising reached, whether the advertising generated any business, how often Price promoted Nulux's products, or whether he promoted the specific fixtures at issue here.

### c.  Sales

Sales success indicates the relevant public's exposure to a product's trade dress and thus is circumstantial evidence of trade dress recognition.  See PaperCutter, 900 F.2d at 564; Ergotron, 1996 WL 143903 at *8.  Evidence defining the size of the market and the plaintiff's share of that market bolsters raw sales figures by providing the context out of which the figures are derived.  See IMIG, Inc. v. Electrolux Home Care Products, Ltd., No. 05 Civ. 0529(JO), 2008 WL 905898, at *11 (E.D.N.Y. March 31, 2008).  Nulux has proffered scant evidence of its sales or of the size and composition of the high-end lighting market prior to the alleged trade dress infringement.

### d.  Unsolicited media coverage

Unsolicited media coverage speaks to trade dress recognition by reflecting the "enthusiasm and loyalty" of the product's customers.  Centaur Commc'ns., 830 F.2d at

1224 (citing <u>Harlequin Enters. Ltd. v. Gulf & W. Corp.</u>, 644 F.2d 946, 950 (2d Cir. 1981). The articles that Nulux has proffered merely mention the company in passing and do not address the design of Nulux's fixtures.

### e.  Plagiarism of the mark

Intentional copying may constitute persuasive evidence of consumer recognition, <u>New Colt</u>, 312 F. Supp. 2d at 208, but does not establish secondary meaning by itself, for copying in the marketplace, absent legal protection, is part of healthy competition.  <u>See</u> <u>DAG Media</u>, 478 F. Supp. 2d. at 375; <u>Kaufman & Fisher Wish Co., Ltd. v. F.A.O.</u> <u>Schwarz</u>, 184 F. Supp. 2d 311, 319 (S.D.N.Y. 2001) ("copying is not always discouraged or disfavored by the laws which preserve our competitive economy").  The intent to copy trade dress may be inferred from the defendant's prior knowledge of the plaintiff's mark along with the similarity between the parties' marks.  <u>Star Indus., Inc. v. Bacardi & Co.</u> <u>Ltd. Corp.</u>, 02 Civ. 4239(HB), 2003 WL 23109750, at *6 (S.D.N.Y. December 31, 2003), <u>aff'd</u>, 412 F.3d 737 (2d Cir. 2005).  However, "it cannot automatically be inferred that intentionally copying a plaintiff's trade dress is for the purpose of deceiving consumers as to the source of the product," for its purpose could just as well have been the incorporation of the product design's intrinsic desirability.  <u>See</u> <u>id</u>.

The record here supports an inference of intentional copying.  Litelab, through Ramirez, had prior knowledge of Nulux designs, and the allegedly infringing fixtures are very similar in appearance to Nulux's.  However, there is no evidence that Litelab intended to deceive consumers and capture Nulux' goodwill rather than to incorporate desirable, unprotected product features into its fixture designs.

In addition, the absence of previous instances of plagiarism by third parties weighs against a finding of secondary meaning.  See Chum Limited v. Lisowski, 198 F. Supp. 2d 530, 536 (S.D.N.Y. 2002) ("Given that no more than one competitor has attempted to use a mark similar to Chum's, the court finds that this factor weighs against a finding of secondary meaning.").  Save for the copying Nulux alleges here, there have been no attempts to plagiarize Nulux's fixture designs.

### f.   Length and exclusivity of trade dress use

"The longer and more exclusive the trade use, the more likely it is that a mark has acquired secondary meaning."  BigStar Entm't., 105 F. Supp. 2d at 203.  Such an evaluation must be done in light of the product and its consumers."  Centaur Commc'ns., 830 F.2d at 1225.  The Nulux fixtures at issue were first produced at varying times between 1992 and 1998.  Nulux's use of the fixture designs was exclusive prior to 2000 and the alleged infringement complained of here.

### g.   Analyzing the elements

When analyzing the elements, the characteristics of the lighting fixture market must be considered to put the various factors into context.  See Centaur Commc'ns., 830 F.2d at 1222.  However, Nulux has not proffered evidence as to the size of the market, the number of manufacturers in it, or the number of specifiers, dealers, and architects.

The record contains only limited anecdotal evidence of relevant consumers' minds, minimal evidence of Nulux's sales and advertising success, and no evidence of unsolicited media coverage or intent to deceive consumers.  Only the length and exclusivity of the trade dress use weighs in favor of secondary meaning.  Drawing all

reasonable inferences in the plaintiff's favor, the record is insufficient to find that the relevant consumers associated Nulux with the trade dress of its fixtures when the alleged infringement began.  Therefore, summary judgment on the claim of trade dress infringement is granted.  Because the analysis of trade dress infringement claims under New York law parallels that under the Lanham Act, Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 119 (2d Cir. 2006), summary judgment is also granted as to Nulux's state law trade dress claim.

## C.      Lanham Act false designation of origin claim

"Section 43(a) also subsumes a broader range of unfair practices which may be generally described as a misappropriation of the skill, expenditures, and labor of another." Atlantis Silverworks, Inc. v. 7th Sense, Inc., No. 96 Civ. 4058(MBM), 1997 WL 128403 (S.D.N.Y. March 20, 1997) (quoting Murphy Door Bed Co. v. Interior Sleep Sys., Inc., 874 F.2d 95, 102 (2d Cir. 1989) (internal quotation marks omitted).  These unfair practices include "reverse passing off" which occurs when the defendant passes off the plaintiff's product as its own.  Id.  A claim for "reverse passing off" under the Lanham Act requires the plaintiff to prove (1) that the product at issue originated with the plaintiff, (2) that origin of the product was falsely designated by the defendant, (3) that the false designation was likely to cause consumer confusion, and (4) that the plaintiff was harmed by it.  See Lipton v. The Nature Co., 71 F.3d 464, 473 (2d Cir. 1995).  The plaintiff need not show protectable trade dress to prevail.  Samoto Designs LLC v. Singh, No. 98 Civ. 5448(LLM), 1999 WL 177430, at *3 (S.D.N.Y. March 30, 1999) (citing Waldman Publ'g. Corp. v. Landoll, Inc., 43 F.3d 775, 784 (2d Cir. 1994)).

Here, Nulux claims that Litelab resold Nulux fixtures as its own but offers no evidence to support its assertions. The non-moving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998). Summary judgment as to the claim for false designation of origin is granted.

**D.    Lanham Act unfair competition claim**

"A plaintiff claiming unfair competition under Section 43(a) must show that it owns a valid trademark eligible for protection." EMI Catalogue P'ship. v. Hill, Holliday, Connors, Cosmopulos, Inc., 228 F.3d 56, 62 (2d Cir. 2000). Trade dress that has acquired secondary meaning is protected from unfair competition under Section 43(a), see id. at 63, but as discussed supra, the record is insufficient to create a question of fact as to secondary meaning. Summary judgment as to the plaintiff's federal unfair competition claim is granted.

**E.    Trademark infringement claim**

Nulux claims that Litelab infringed on its "Nulux" and "Slotlux" trademarks but did not include the "Slotlux" infringement claim in its Amended Complaint. "The purpose of notice pleading is to provide the defendant with fair notice of what the plaintiff's claim is and the grounds upon which it rests." Tiffany (NJ) Inc. v. eBay, Inc., No. 04 Civ. 4607(RJS), 2007 WL 4104037, at *1 (S.D.N.Y. Nov. 9, 2007) (quoting Swierkiewicz v. Soreman N.A., 534 U.S. 506, 512 (2002) (internal quotation marks omitted). Exploring issues in discovery is insufficient to put the defendants on notice.

<u>Tiffany (NJ) Inc.</u>, 2007 WL 4104037 at *1.  The claim regarding "Slotlux" must therefore be dismissed.  The Amended Complaint, however, did provide sufficient notice as to Litelab's "unauthorized use of Nulux's name."  Amended Complaint ¶ 70.

A claim of trademark infringement under the Lanham Act requires proof of the defendants' unauthorized use of a valid trademark in connection with the sale or distribution of the defendants' goods or services and the likelihood of confusion from such use.  <u>See</u> <u>24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC</u>, 277 F. Supp. 2d 356, 361 (S.D.N.Y. 2003).  "Trademark is not property in the ordinary sense but only a word or symbol indicating the origin of a commercial product," the owner of which "acquires the right to prevent the goods to which the mark is applied from being confused with those of others and to prevent his own trade from being diverted to competitors through their use of misleading marks."  <u>Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc.</u>, 754 F.2d 91, 97 (2d Cir. 1985).  Even if Ramirez had used a request form displaying the trademark "Nulux" when ordering a diamond core drill from a tool vendor, such use was not in connection with Litelab's goods or services, nor was it likely to confuse Nulux's consumers.  Because the Lanham Act does not protect Nulux's mark from the use alleged here, summary judgment as to the plaintiff's claim of trademark infringement is granted.

**F.    Injunctive relief**

Nulux's request for permanent injunctive relief, <u>see</u> Amended Complaint ¶¶ 96, 97, requires, at a minimum, a showing of irreparable harm and likelihood of success on the merits of its claims.  <u>Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.</u>, 596 F.2d 70, 72 (1979).  In light of the foregoing, those prerequisites are not satisfied.

**G.      Pendent state law claims**

The plaintiff's federal claims are dismissed.  Accordingly, the Court declines to exercise supplemental jurisdiction over the plaintiff's pendent state law claims.  See 28 U.S.C. § 1367(c); Castellano v. Bd. of Trs., 937 F.2d 752, 758 (2d Cir. 1991) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." (quotation omitted)). The pendent state law claims are dismissed without prejudice.

## CONCLUSION

While claims such as these "are often fact intensive, summary judgment may nevertheless be appropriate in such cases."  Friesland Brands, B.V. v. Vietnam Nat'l. Milk Co., 228 F. Supp. 2d 399, 403 (S.D.N.Y. 2002).  For the aforementioned reasons, the defendants' motion for partial summary judgment is GRANTED in part and DENIED in part.


Dated:          Brooklyn, New York
                October 31, 2008


                                    _____/s/_____

                                    I. Leo Glasser
                                    United States Senior District Judge

Copies of the foregoing memorandum and order were electronically sent to:

Counsel for Plaintiff:

Martin S. Rapaport, Esq.
18 East 48th Street, 6th Floor
New York, New York 10017

Counsel for Defendants Ramirez and Storch:

Ira A. Finkelstein, Esq.
Lawrence S. Reich, Esq.
Blank Rome Tenzer Greenblatt LLP
405 Lexington Avenue, 15th Floor
New York, New York 10174

Counsel for Defendant Litelab Corporation:

Paul I. Perlman, Esq.
William H. Gardner, Esq.
Hodgson Russ LLP
One M & T Plaza, Suite 2000
Buffalo, New York 14203